# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO TABAREZ, | 1:07cv1001 OWW DLB HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | (Document 1) |
| KEN CLARK, Warden, | |
| Respondent. | |

Petitioner Mario Tabarez ("Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY[1]**

On October 20, 2004, in the Kern County Superior Court, a jury convicted Petitioner of two counts of attempted murder (victims Susie Martinez and Officer Mario Nunez), two counts of assault with a firearm (victims Susie and Alex Martinez), two counts of assault with a firearm on a police officer (victims Officers Nunez and Jose Guzman), and one count of arson of an inhabited structure. The jury further found, with respect to the attempted murder and assault

---

[1] This information is derived from the petition for writ of habeas corpus and Respondent's answer to the petition.

1

counts, that Petitioner personally used a firearm when committing the offenses. He was acquitted of two counts of attempted murder (victims Alex Martinez and Officer Guzman).

On December 9, 2004, Petitioner was sentenced to an indeterminate term of life with the possibility of parole plus a 20 year enhancement, and a determinate term of 41 years, 8 months.

Petitioner appealed to the Fifth District Court of Appeal. The Court affirmed the conviction and sentence on February 1, 2006.

Petitioner filed a petition for review in the California Supreme Court, which was denied on April 12, 2006. Review was denied without prejudice "to any relief to which defendant might be entitled after the United States Supreme Court determines in Cunningham v. California, No. 05-6551, the effect of Blakely v. Washington (2004) 542 U.S. 296 and United States v. Booker (2005) 543 U.S. 220, on California law."

On July 13, 2007, Petitioner filed the instant federal petition. He argues that (1) he was denied his right to due process and a fair trial based on the trial court's refusal to instruct on the lesser included offense of attempted voluntary manslaughter; and (2) he was denied his right to a jury trial when the court acted in excess of its jurisdiction by sentencing Petitioner to consecutive terms.[2]

Respondent filed its answer on October 12, 2007.

Petitioner filed his traverse on November 13, 2007.

## STATEMENT OF FACTS[3]

The events which formed the basis for the charges took place on March 29, 2004. Prior to this time, Petitioner was embroiled in a family dispute over his mother's home. Petitioner and Michelle Contreras had lived with, and taken care of, Petitioner's mother, and they believed she

---

[2] Insofar as Petitioner attempts to add a new claim relating to his inability to present evidence of mental competency at the time of the incident by presenting the issue in his traverse, he cannot do so. While Petitioner is entitled to respond to Respondent's arguments, he cannot raise a new claim for the first time in a traverse. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994) (noting that a district court need not consider claims raised for the first time in a traverse). To the extent Petitioner's arguments relate to issues raised in the answer, the Court will discuss them below.

[3] The Statement of Facts is taken from the Fifth District Court of Appeal's February 1, 2006, opinion. To the extent additional facts are necessary to decide Petitioner's claims, they will be discussed below.

left the house to Petitioner and his brother when she died in June or July 2003. About three months after her death, however, Petitioner's sisters took him to court and then had him forcibly evicted from the house based on what he claimed was a forged quitclaim deed that purported to give ownership of the house to the sisters. Petitioner felt he was not treated fairly, and had to be talked out of the house by Delano Police Officer Nunez. After the incident, Petitioner showed Nunez some documents that he believed proved he had been defrauded out of the house. Nunez investigated Petitioner's complaint, but was unable to resolve the issue. According to Michelle Contreras, the dispute over the house resulted in Petitioner's brother, Ricky, physically attacking Petitioner. Petitioner's nephew, a gang member also named Ricky, threatened Petitioner. Michael Ortiz, a friend of Petitioner, was assaulted on three occasions because he was mistaken for Petitioner. Petitioner eventually started carrying a broken gun for protection because people were calling and threatening him and even shooting at him. About a month before the March incident, Petitioner told Alfred Yanez that people were chasing him and trying to kill him, that they had a lien on him, and that there were cameras in the trees. Yanez unsuccessfully tried to get psychiatric help for Petitioner.

Shortly after 8:00 a.m. on March 29, Michelle Contreras dropped Petitioner off at the home of Susan and Alexander Martinez, his niece and her husband. Although they had not seen each other in a while, Petitioner and Susie had a very good relationship prior to this day. There had been no interaction between Petitioner and the Martinezes to cause any friction, and Susie was unaware of the situation in which her mother evicted Petitioner from property that belonged to Susie's grandmother. According to Contreras, Petitioner was not upset this day; he simply missed his family and did not care about the house any more.

Alex answered the doorbell. Petitioner, who did not seem upset but did not look normal, asked whether Susie was there, then came inside. When Susie came out of the kitchen, Petitioner told her that her family was trying to throw him out of his house. He said they had a home and had properties all over the place, and that the FBI was after them. He also said that Little Ricky, Susie's cousin, was after him, and that Susie had better tell Ricky to leave him alone. Petitioner told Susie to call her mother, and warned that he was not messing around. He said people were

3

after him. Petitioner spoke rapidly. His voice was normal in the beginning, but then grew louder. His eyes were very wide and he was looking around as if he was paranoid. He was moving his hands up and down and saying things that were not normal. Alex had seen Petitioner in the past, and Petitioner did not always act this way.

Alex waited until Petitioner finished speaking, then told him that he needed some help. Petitioner responded that he did not need any help, then pulled a .38-caliber revolver from his pocket and began waving it around. Petitioner pointed the gun at Alex and Susie and told Alex to call Cora (Susie's mother). Alex pretended to do so, but dialed 911 instead. Hoping the 911 dispatcher would hear and send help, Alex told Petitioner two or three times to put down the gun. He tried to remain calm, but he was afraid for Susie and himself and for their four-year-old daughter, who had come into the room.

When Petitioner kept insisting that he wanted to talk to Cora, Alex hung up, handed the telephone to Susie, and told her to call. Petitioner wanted Susie to call Cora so that Cora would stop having people follow him.

Susie started to dial, and Petitioner closed and locked the door and said that nobody was going to go anywhere. When he turned toward the door, Alex grabbed him and tried to hold onto the gun. They fell to the ground, struggling. Alex seized the gun with both hands, but Petitioner managed to point it at his chest. He kept telling Alex to let go, then he tried to pull the trigger. Because Alex was holding tightly to the cylinder, the gun clicked but did not fire. Petitioner then started hitting Alex in the face and trying to gouge his eyes. Meanwhile, Susie dialed 911, sent her daughter outside, and started yelling for help. Police were dispatched to the residence.

Petitioner managed to gain his feet, while Alex was still on the ground. Petitioner pointed the gun at his head and said he was going to kill him. He grabbed Susie by the hair and pointed the gun at her head. He told them to get on their knees and pray. Susie started praying out loud; Petitioner was yelling that they were going to die now because they should have just called Cora. He said the police had better not come, or Susie was dead. He then grabbed Susie by the hair and dragged her to the dining room table, where she had left the telephone. He had the gun to her head. When Alex stood up, Petitioner pointed the gun toward him and told him to

get away. Susie used the opportunity to dive through the window. Petitioner shot at her, but she got away. Alex turned and ran out the back door, grabbed his daughter who was in the back yard, and ran to the side gate. The police were there, and the Martinezes were taken to safety.

The police arrived shortly before Susie escaped through the window. As they approached the house, Officer Nunez could hear arguing inside and recognized Petitioner's voice.

Nunez heard Petitioner say, "get on your knees, bitch, you're going to die," and another male voice saying, "just let me go, put the gun down, just let her go." About 10 seconds later, Susie crashed through the window, landed on her side, and started to run. A gunshot came from inside the residence. Nunez saw the bullet embed into the grass where Susie had landed. She was already moving when it struck, and it hit within one or two feet of her.

As Susie ran, Petitioner came out of the house and ran toward her. His gun was at his side. When he saw Officer Guzman, he ran back inside the house. The officers took up protective positions. Petitioner exited the house, gun in hand, and asked for Nunez by name. Nunez acknowledged him, then told him to put down the gun.

Petitioner came outside several times and yelled at the officers. On one occasion, he pointed a gun at Lieutenant Mendenhall. About the third time Petitioner came outside, he said he wanted to talk to Nunez. When Nunez responded, Petitioner said, "where are you, mother fuck, you burned me," apparently a reference to their earlier interaction. He then raised his gun toward Nunez and Guzman, who were right next to each other, and fired. Nunez, Guzman, and other officers returned fire. Petitioner moved as if he had been struck, then ran back into the residence. He said, "you missed me, mother fuckers, come and get me, I'm still alive."

After Petitioner returned to the house, Mendenhall heard him say, "you better call the fire department." Sometime later, smoke began billowing out of the house from fires set in three locations. Firefighters were summoned, but were not immediately allowed access. The residence burned perhaps 30 minutes, and eventually Petitioner came out of the house and surrendered. He was bleeding from multiple gunshot wounds. His gun was recovered from the side yard of the residence. It had a five-round capacity, and contained three live rounds and two spent cartridges.

**DISCUSSION**

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. Petitioner challenges his conviction imposed by the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court

proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.      Jury Instruction

Petitioner first contends that the trial court violated his due process rights and his right to a fair trial by refusing to instruct on the lesser included offense of attempted voluntary manslaughter. He believes that the instruction should have been given based on evidence in the record "that [he] was involved in a sudden quarrel and acted in self-defense of his person." Petition, at 5.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. Beck v. Alabama, 447 U.S. 625, 638 (1980). In a noncapital case, the failure of a trial court to instruct sua sponte on lesser included offenses does not present a federal constitutional question. Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), *overruled on other grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en*

*banc*) (finding the application of Beck to noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300, 109 S.Ct. 1060, 1069 (1989)); James v. Reese, 546 F.2d 325, 327 (9th Cir.1976) (*per curiam*). However, a defendant may suffer a due process violation if the court's failure to give a requested instruction prevents a defendant from presenting his theory of the case. Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984); see also United States v. Mason, 902 F.2d 1434, 438 (9th Cir.1990) ("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence."). This exception is available only if there is substantial evidence to warrant the instruction on the lesser included offense. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

In this case, Petitioner's counsel asked that the jury be instructed on attempted voluntary manslaughter. The trial court denied counsel's request, finding that "there does not appear to be any evidence whatsoever to suggest this was a heat of passion or anything that would make this type of voluntary manslaughter, attempted voluntary manslaughter." RT 539.

As explained above, a failure to instruct on a lesser included offense in a non-capital case is only cognizable if the refusal prevents a defendant from presenting his theory of the case. It does not appear, however, that Petitioner's defense was based on either heat of passion or some type of self-defense. Rather, Petitioner presented evidence at trial (1) to suggest that his injuries would have prevented use of his left upper extremity (RT 396-402); (2) to demonstrate that the officers' shooting was unjustified (RT 431-438, 452-455); (3) to demonstrate that he had reasons to be upset with other family members, but *not* those involved in the shooting (RT 465, 466, 474-475, 500-504, 520, 529, 534); and (4) to demonstrate that he suffered psychological problems after his mother's death (RT 517-520, 524).

In any event, even assuming that Petitioner's claim is cognizable under the exception set forth in Bashor, there was no constitutional error in this case. The Fifth District Court of Appeal denied this claim on direct appeal. After setting forth the applicable California law, it explained:

> We are concerned here with appellant's convictions for attempting to murder Susie Martinez and Officer Nunez. We turn first to the theory of attempted voluntary manslaughter based on sudden quarrel or heat of passion. In this regard, "'provocation

and heat of passion must be affirmatively demonstrated.' [Citations.] The heat of passion requirement for [attempted] manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, [attempt] to kill under the heat of passion [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively . . . . '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (People v. Steele (2002) 27 Cal.4th 1230,1252-1253.) This being the case, it is immaterial that appellant may have been suffering from psychological problems. (Id. at p. 1253; People v. Danielly (1949) 33 Cal.2d 362,377; In re Thomas C. (1986) 183 Cal.App.3d 786, 798.)

Provocation sufficient to reduce attempted murder to attempted voluntary manslaughter "need not occur instantaneously, but may occur over a period of time." (People v. Wharton (1991) 53 Cal.3d 522, 569.) Thus, leaving aside any consideration of a cooling-off period, it is conceivable the circumstances of appellant's eviction from his mother's house could constitute provocation. This in no way helps appellant, however, because "[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.]" (People v. Lee (1999)20 Cal.4th 47, 59 (plur. opn. of Baxter, J.); People v. Lujan (2001) 92 Cal.App.4th 1389,1411-1412; People v. Spurlin (1984) 156 Cal.App.3d 119, 125-126.) There is absolutely no evidence of a sudden quarrel between appellant and Nunez, or that Nunez engaged in any sort of conduct that could have constituted provocation. He simply did his job. (See People v. Williams (1988) 199 Cal.App.3d 469, 475-476.) Nor is there any evidence that Susie did anything provoking. Up until this incident, she and appellant had a very good relationship, and, although her mother apparently was one of the people responsible for appellant's eviction, Susie testified, without contradiction, that she was unaware of the situation. There was no suggestion appellant reasonably believed her to be involved. Appellant suggests he was provoked by Alex and Susie saying he needed help and calling the police. Even if true, however, neither this nor Susie's escape constitute the kind of provocation the law recognizes as being sufficient to reduce attempted murder to attempted voluntary manslaughter. (See People v. Balderas (1985) 41 Cal.3d 144,196-197 [predicable conduct by resisting victim insufficient]; People v. Jackson (1980)28 Cal.3d 264, 306 [plur. Opn. Of Richardson, J.], disapproved on other grounds in People v. Cromer (2001) 24 Cal.4th 889, 901, fn. 3 [same].)

With respect to so-called imperfect self-defense, if a defendant attempted to kill another person "because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice" and cannot be convicted of attempted murder. (In re Christian S. (1994) 7 Cal.4th768, 783.) "[T]he doctrine is narrow. It requires without exception that the defendant must have had an actual belief in the need for self-defense . . . . Fear of future harm-no matter how great the fear and no matter how great the likelihood of the harm-will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury.'"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with." . . . [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.]" (Ibid.)

Nothing in the evidence adduced at trial even hints appellant somehow thought Susie was a threat. Appellant says he had been attacked and believed people were following him. This does not suggest he believed he was in imminent danger while inside Susie's house.

9

He did not shoot at the people who attacked him (for instance, Ricky), but instead fired a shot at Susie as she made her escape. As for his shooting at Nunez, it is possible Guzman fired first. However, "[i]t is well established that the ordinary self-defense doctrine-applicable when a defendant reasonably believes that his safety is endangered-may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.[Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (In re Christian S., supra, 7 Cal.4th at p. 773, fn. 1.) Thus, since the uncontradicted evidence showed appellant to be the initial aggressor and Nunez's (and Guzman's) response legally justified, appellant cannot rely on unreasonable self-defense as a ground for attempted voluntary manslaughter. (See People v. Seaton (2001) 26 Cal.4th 598, 664; People v. Williams, supra, 199 Cal.App.3d at p. 476.)

This decision is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. As the Court of Appeal explained, there was little, if any, evidence that would have supported the requested instructions given the requirements of California law. As to heat of passion and provocation, there is no evidence that Petitioner harbored any resentment towards Suzie or Alex Martinez. Rather, the defense presented evidence to demonstrate that Petitioner and Susie had a good relationship. Nor is there any evidence that those at the scene acted in a way that would cause an ordinarily reasonable person to attempt to kill. Petitioner does not identify any such evidence, but instead suggests that his actions were "not a result of the interactions of the Martinezes and [Petitioner], but rather grew out of whatever demons that did haunt [Petitioner's] mind." Traverse, at 20. The objective component of a heat of passion defense precludes such a finding, however.[4]

Similarly, there was little evidence to support imperfect self-defense instructions. Under California law, imperfect self-defense requires an actual, yet unreasonable, belief that it is necessary to defend oneself from imminent peril to life or great bodily injury. In re Christian S., 7 Cal.4th 768, 773 (1994). More importantly, the defense cannot be invoked by a defendant who, through his own wrongful conduct, created the circumstances under which an attack or pursuit is legally justified. Id. at n. 1. The Court of Appeal correctly determined that nothing in the evidence suggested that he felt harmed or threatened by either Susie or her husband. Although he contends that he feared for his life and presented evidence of threats from other

---

[4] Petitioner did not question his competency during his trial and, contrary to Petitioner's suggestion, this Court is not obligated to undertake such an analysis.

1  individuals, there is no evidence to suggest that Petitioner believed that he was in imminent
2  danger while inside Susie's house.  Moreover, the defense is foreclosed because the evidence
3  shows that Petitioner went to their house and threatened them, which would have entitled Alex to
4  defend himself, his wife and their child.  The evidence further demonstrates that even after he
5  regained control of the gun, Petitioner pointed the gun at their heads and told them to get down
6  on their knees and pray.  He grabbed Susie by the hair and dragged her to the dining room table,
7  with the gun to her head.  She eventually dove out the window and Petitioner fired at her as she
8  escaped.  Even if Petitioner could validly argue that he had an unreasonable belief that he was in
9  imminent danger, his continued violence after he regained control of the gun negates such a
10 suggestion.

11       As to Officer Nunez, the evidence simply shows that he responded to the scene to
12 investigate the disturbance at the house, arriving before Susie escaped through the window.
13 Petitioner became combative with the officers and pointed his gun at them.  In other words, the
14 situation in which he found himself was of his own making.  Any threat that he theoretically
15 could have perceived arose from his own wrongful conduct, beginning with Susie and Alex and
16 continuing with the responding officers.

17       Petitioner's claim is without merit and should be denied.

18 D.    <u>Imposition of Consecutive Sentences</u>

19       Finally, Petitioner argues that he was denied his right to a jury trial under the Sixth
20 Amendment when the court sentenced him to consecutive terms based on facts that were neither
21 found true beyond a reasonable doubt by the jury nor admitted by Petitioner.  Petitioner cites
22 Blakely v. Washington, 542 U.S. 296 (2004), and Cunningham v. California, 549 U.S. 270
23 (2007), in support of his argument.

24       Petitioner was sentenced on December 9, 2004.  On the attempted murder charge
25 involving the intentional and personal discharge of a firearm on Officer Nunez, Petitioner was
26 sentenced life with the possibility of parole, plus a 20 year enhancement for the firearm use.  In
27 imposing the determinate portion of his sentence, which totaled 41 years, 8 months, the court
28 sentenced Petitioner as follows:  on the attempted murder charge of Susie Martinez, Petitioner

received a seven-year middle term, plus 20 years for the firearm use. On the assault with a firearm charge against Alex Martinez, he received a consecutive one-year term, plus three years, four months for the firearm use, to be served consecutively. On the assault with a firearm charge against Officer Guzman, he received a consecutive two-year term, plus six years, eight months for the firearm use. On the arson charge, he received a consecutive one-year, eight-month term. The judge found consecutive sentencing appropriate because "the crimes and their objectives were predominately independent of each other." RT 714. "They did involve separate acts of violence or threats of violence." RT 714.

In denying his claim on appeal, the Court of Appeal relied on state law as it existed at that time, explaining:

> The California Supreme Court recently undertook an extensive analysis of these cases (and United States v. Booker (2005) 543 U.S. 220) and concluded that the imposition of consecutive terms, as provided under California law, is constitutional. (People v. Black (2005) 35 Cal.4th 1238, 1244, 1262). We are bound by this holding (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455), and find no act in excess of jurisdiction.

Prior to discussing the Court of Appeal's opinion, a review of relevant case law is necessary. In Apprendi v. New Jersey, the Supreme Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon finding, by a preponderance of the evidence, that the defendant "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation, or ethnicity." Apprendi, 530 U.S. 466, 469 (2000). The Court held that "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to jury, and proved beyond a reasonable doubt." Id. at 490. (Emphasis added.)

The Supreme Court next decided Blakely v. Washington, where it explained that the "statutory maximum" for Apprendi purposes was the "maximum" sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional facts." Blakely, 542 U.S. 296, 303-304 (2004).

In both Apprendi and Blakely, state law established an ordinary sentencing range for the crime of conviction, but allowed the court to impose a sentence in excess of that range if it determined the existence of specified facts not intrinsic to the crime. In each case, the Supreme Court held that a sentence in excess of the ordinary range was unconstitutional because it was based on facts that were not admitted by defendant or found true by the jury beyond a reasonable doubt.

Soon after Blakely, the Supreme Court decided United States v. Booker, 543 U.S. 220 (2005), where the Court applied Blakely to the Federal Sentencing Guidelines and found the Guidelines unconstitutional. In reforming the Guidelines, the Court stated, "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." Id. at 233. "For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." Id.

In 2005, the California Supreme Court analyzed California's Determinative Sentencing Law in light of Blakely and Booker, and determined that it was constitutional. In People v. Black, the California Supreme Court explained:

> Blakely and Booker established a constitutionally significant distinction between a sentencing scheme that permits judges to engage in the type of judicial fact finding typically and traditionally involved in the exercise of judicial discretion employed in selecting a sentence from within the range prescribed for an offense, and a sentencing scheme that assigns to judges the type of fact-finding role traditionally exercised by juries in determining the existence or nonexistence of elements of an offense. . . [I]n operation and effect, the provisions of the California determinate sentence law simply authorize a sentencing court to engage in the type of fact-finding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range.

Black, 35 Cal.4th at 1253-1254. The court held that the "presumptive" midterm does nothing more than establish a "reasonableness" constraint on an otherwise wholly discretionary sentencing choice akin to that which the United States Supreme Court has deemed constitutional. Id. at 1261.

As Petitioner points out, the Supreme Court invalidated Black in the recent Cunningham decision, where it held that the middle term in California's determinate sentencing law was the relevant statutory maximum for the purpose of applying Blakely and Apprendi. Cunningham v. California, 549 U.S. 270 (2007). Specifically, the Court held that imposing the upper sentence violated the defendant's Sixth and Fourteenth Amendment right to a jury trial because it "assigns to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated 'upper term' sentence." Id.

On its face, the Court of Appeal's decision, in relying on Black, appears to be contrary to Supreme Court precedent. However, the Supreme Court's decisions in Apprendi, Blakely, Booker, and Cunningham contain no indication that the holdings apply to a judge's authority to impose consecutive sentences. Rather, Apprendi, Blakely, and Booker focused on the finding of a fact "that increases the penalty for a crime beyond the prescribed statutory maximum." Blakely, 542 U.S. at 301; Apprendi, 530 U.S. at 490. Indeed, the sentence ultimately struck down in Cunningham was an upper term for a single conviction. Cunningham, 127 S.Ct. at 860-861.

Here, Petitioner received mid-term sentences that were imposed consecutively, a determination that the judge was authorized to make. The trial judge did not, therefore, increase Petitioner's sentence beyond that which was statutorily authorized by the jury's finding. Rather, he exercised his discretion to impose a sentence that was within the maximum sentence allowable on the basis of the facts already reflected in the jury verdict. As the Black court noted on remand: "The high court's decision in Cunningham does not call into question the conclusion we previously reached regarding consecutive sentences," which held that "imposition of [consecutive sentences] does not implicate a defendant's Sixth Amendment rights." People v. Black, 41 Cal.4th 799, 821-23 (2007). This Court therefore has no basis to conclude that the state court's finding was contrary to, or an unreasonable application of current Supreme Court precedent. See Carey v. Musladin, 549 U.S. 70 (2006) ("Given the lack of holdings from this Court regarding" the claim, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (alterations in original)).

Even if these cases could be interpreted as applying to consecutive sentences, relief is precluded. Because Cunningham was decided *after* Petitioner was sentenced and the Court of Appeal issued its decision, the Court must decide whether the holding should be applied retroactively to Petitioner on collateral review.[5] The Ninth Circuit has not addressed the issue. For the reasons discussed below, this Court, like several other district courts, finds in the negative. See e.g. Fennen v. Nakayema, 494 F.Supp.2d 1148, 1155-1156 (E.D.Cal.2007); Jordan v. Evans, 2007 WL 2703118, *10-11 (S.D.Cal.); Marquez v. Evans, 2007 WL 2406867, *8-9 (N.D.Cal.).

In Teague v. Lane, the Supreme Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. 288, 310 (1986). A new rule is one which "breaks new ground or imposes a new obligation on the States or the Federal Government;" in other words, a new rule is one where "the result was not dictated by precedent existing at the time of the defendant's conviction became final." Teague, 489 U.S. at 301; Snook v. Wood, 89 F.3d 605, 612 (9th Cir.1996).

A Teague analysis requires the Court to engage in a three step inquiry. First, the Court must determine the date the petitioner's conviction became final. See Caspari v. Bohlen, 510 U.S. 383, 390 (1994); Snook, 89 F.3d at 612. Second, the Court must survey the legal landscape as it existed when the petitioner's conviction became final and determine whether a state court considering the petitioner's claim at that time would have felt compelled by existing precedent to conclude that the new rule was required by the Constitution. Caspari, 510 U.S. at 390; Saffle v. Parks, 494 U.S. 484, 488 (1990). Third, if the Court determines that the petitioner seeks the

---

[5] "State convictions are final 'for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.'" Beard v. Banks, 542 U.S. 406, 411 (2004) (citations omitted). Here, Petitioner's conviction became final on or about July 12, 2006, when the ninety day period after the California Supreme Court denied his petition expired. Barefoot v. Estelle, 463 U.S. 880, 887 (1983); Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir.1999) (concluding period of "direct review" includes the period within which one can file a petition for a writ of certiorari in the United States Supreme Court); Smith v. Bowersox, 159 F.3d 345, 347 (8th Cir.1998). Apprendi, Blakely, and Booker were all decided before Petitioner's conviction became final; however, Cunningham was not decided until January 22, 2007, well after Petitioner's conviction became final.

15

benefit of new rule, the Court must consider whether the relief sought falls within one of the two narrow exceptions to non-retroactivity. See Gilmore v. Taylor, 508 U.S. 333, 345 (1993).

The Court first notes that neither Apprendi, Blakely, nor Booker, have been applied retroactively. United States v. Cruz, 423 F.3d 1119, 1121 (9th Cir.2005); Sanchez-Cervantes, 282 F.3d 664, 666-667 (9th Cir.2002); Schardt v. Payne, 414 F.3d 1025 (9th Cir.2005). It is therefore unlikely that Cunningham would be applied retroactively. This finding is supported by several district courts that have addressed the issue. See e.g. Fennen v. Nakayema, 494 F.Supp.2d 1148 (E.D.Cal. 2007); Rosales v. Horel, 2007 WL 1852186 (S.D.Cal. 2007); Salerno v. Schriro, 2007 WL 2153584 (D.Ariz. 2007).

Turning to the Teague factors, Petitioner's conviction became final on or about July 12, 2006, as explained above. To the extent Petitioner may argue that Blakely was decided before his conviction became final, and Cunningham is merely an extension thereof, such argument is not persuasive. To make that determination, this Court would have to find that the holding in Cunningham was dictated by Blakely. A new rule is defined as "a rule that ... was not 'dictated by precedent existing at the time the defendant's conviction became final.'" Whorton v. Bockting, 127 S.Ct. 1173 (2007). This Court finds that Cunningham constitutes a "new rule" under Teague. As the holding in Cunningham is similar in reasoning to the holdings in Apprendi, Blakely, and Booker, it too constitutes a "new rule" under Teague.

Further, the Cunningham decision was a six-member majority opinion. Justices Alito, Kennedy, and Breyer, filed a dissenting opinion, reasoning that Apprendi should not be extended to California's determinate sentencing law, because the sentencing scheme was indistinguishable from the advisory Guideline scheme approved of in Booker.[6] Justice Alito, writing for the dissent stated that "the Booker Court unanimously agreed that judicial factfinding under a purely advisory guidelines system would [ ] comport with the Sixth Amendment." Cunningham, 127 S.Ct. at 874. It was noted that "the California law gives a judge at least as much sentencing

---

[6] Justices Kennedy and Breyer also believed that Apprendi could be applied to only sentencing enhancements based on the nature of offense (jury determination) and not the nature of the offender (judicial determination). 127 S.Ct. at 872-873.

1  discretion as does the post-Booker federal scheme." Id. at 877. "The California scheme-like the
2  federal 'advisory Guidelines'-does require that this discretion be exercised reasonably." Id. at
3  878.

4       In light of the split and strong dissent in the Cunningham decision, it simply cannot be
5  said that the result in Cunningham was dictated by Blakely. Even though the holding in Blakely
6  was the central reasoning in support of the majority opinion in Cunningham, mere application of
7  a prior decision is not equivalent to being "dictated by precedent." Because three justices found
8  that California's sentencing scheme was more akin to the advisory Guidelines of which Booker
9  approved, this Court finds that "reasonable jurists" could find the same. See e.g. Whorton, 127
10 S.Ct. at 1181.

11      Finally, the Cunningham decision does not come within either of the two exceptions to
12 the Teague nonretroactivity doctrine. It is strictly a procedural rule that does not prohibit
13 punishment for a certain class of individuals because of their status or offense. Nor does the
14 mere fact finding change from judge to jury announce a watershed rule of criminal procedure.
15 See Graham v. Collins, 506 U.S. at 477-78 (the two narrow exceptions are (1) "the rule places a
16 class of private conduct beyond the power of the State to proscribe ... or addresses a substantive
17 categorical guarante[e] accorded by the Constitution;" or (2) the rule announces a "watershed
18 rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal
19 proceeding.") (internal quotations omitted.)

20      Teague would therefore bar habeas relief on this claim.
21      For the many reasons discussed above, Petitioner's claim is without merit and should be
22 denied.

23                          **RECOMMENDATION**

24      The Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be
25 DENIED.

26      This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger,
27 United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B)
28 and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern

1  District of California.  Within thirty (30) days after being served with a copy, any party may file
2  written objections with the court and serve a copy on all parties.  Such a document should be
3  captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the
4  objections shall be served and filed within ten (10) court days (plus three days if served by mail)
5  after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant
6  to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the
7  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951
8  F.2d 1153 (9th Cir. 1991).

10     IT IS SO ORDERED.
11     Dated:   **May 15, 2008**              /s/ Dennis L. Beck
                                       UNITED STATES MAGISTRATE JUDGE